## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOHN SMITH, | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No.:  1:22-cv-269 |
| PROVIDENCE COLLEGE, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM IN SUPPORT OF
## JOHN SMITH'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF

Plaintiff John Smith requests a temporary restraining order and preliminary injunctive relief against Defendant Providence College (the "College") on the basis that the College has imposed a one-year suspension and other sanctions on him through a flawed and unfair disciplinary process that violated his contractual rights to, inter alia, confidentiality, the assistance of an advisor, an individual hearing, and the opportunity to present relevant information and witnesses. This irregular proceeding has caused irreparable harm to John's education and professional career goals, as well as reputational and emotional harm for which no adequate legal remedy exists.

## FACTUAL BACKGROUND

This action stems from an altercation on the campus of Providence College in which John Smith played a peripheral role.  The altercation took place in the early morning hours of April 9, 2022, when John, a student at the College, was exiting the McCarthy Hall dormitory with two friends, Freshman 1 and Freshman 2.  (Para. 23).[1]  All three were first-year students.  (Paras. 4, 6-7).  As the group was leaving, they encountered two upperclassmen, Junior 1 and Junior 2, whom they did not know.  (Para. 24).  All of the men had been drinking.  (Para. 25).  The two juniors – who were bigger and older than the freshmen – began tossing insults.  (Para. 26).  The three

---

[1] All paragraph references herein are to John's Verified Complaint filed on July 18, 2022.

freshmen initially ignored the insults until one particularly biting provocation stirred Freshman 1 to turn and face his tormentors.  (Para. 27).  Freshman 1 walked back toward the older students.  (Para. 28).  Junior 1 pushed Freshman 1.  (Para. 29).  Freshman 1 pushed Junior 1 back, and in short order, the two were rolling on the ground exchanging blows.  (Para. 29).  Junior 2 then rushed to join the ruckus, but John – who has never taken part in a physical altercation in his life – tried to restrain him in an effort to deescalate the situation.  (Paras. 15, 30).  In so doing, John made no contact with Junior 1.  (Para. 31).  The altercation then subsided, and the two groups went their separate ways.  (Para. 32).

A day and a half later, Junior 1 walked into the Public Safety Office at Providence College and declared that he wanted to report an assault. (Para. 33).  He claimed that the altercation was a homophobic attack spurred by the hearts on his shoes.  (Para. 34).  He claimed that he was throwing up outside of McCarthy Hall when an unknown male tackled him to the ground, though the three freshmen observed him urinating on McCarthy Hall, not vomiting, when they arrived.  (Para. 25, 35).  Public Safety set about conducting an investigation.  (Paras. 36-37).

In the process of their investigation, Public Safety interviewed Junior 2, Witness A, and all three freshmen.  (Para. 37).  Witness A, who was merely passing by, is the only person who claimed John participated in the punching and kicking of Junior 1.  (Paras. 38-39).  As for Junior 2, he agreed that he was occupied with John, but reversed the roles and claimed that he held John back, not vice versa.  (Para. 40).  The College then charged all three freshmen with an identical set of violations of the Code of Student Conduct:

4a.    Underage possession or consumption of alcohol anywhere on College property, at College-sponsored events, student organization/club/team events, or off-campus establishments.

4f.    Intoxication, regardless of age, in public or private.

11a.    Non-sexual physical abuse or assault.

11b.    Verbal abuse.

MEMORANDUM IN SUPPORT OF
JOHN SMITH'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF
Page 2 of 13

11c.    Any conduct that creates an intimidating, hostile or offensive campus, education or working environment for another person or group of persons.

11n.    Unauthorized physical conduct.

(Paras. 41-42).

In an email dated April 27, 2022, Martin Connell, the College's Director of Community Standards, informed the three freshmen, "we intend to administer a joint hearing for this group of students . . . To participate in the joint hearing, we will ask you to sign a waiver that will be sent to you by email."  (Para. 43).  One week later, on May 3, 2022, Mr. Connell met with all three freshmen together.  (Para. 44).  During that meeting, he again announced that the hearing would be a joint hearing and asked if all were fine with that.  (Para. 44).  In each other's presence and unaware of other options, no one objected.  (Para. 44).  But, Mr. Connell said nothing about confidentiality or a waiver.  (Para. 45).  In fact, John never received nor signed a waiver of confidentiality.  (Para. 46).

Two days before the hearing, on May 3, 2022, the College sent the three freshmen a link to the hearing case file.  (Para. 49).  The case file contained witness statements from each of the three freshman students, from the two juniors, and from Witness A.  (Para. 50).  The same day, Mr. Connell invited the freshmen to propose questions for the witnesses either prior to the hearing or while the hearing was live.  (Para. 51).  Neither the case file nor Mr. Connell's communications contained a list of witnesses who would be present at the hearing.  (Para. 52).  Thus, the implication was that all would be present.  (Para. 52).  Unfortunately, that was not to be.

In addition to misleading the three freshmen about which witnesses would be present, Mr. Connell discouraged the students from selecting advisors to assist them in the disciplinary process.  (Para. 53).  Mr. Connell told them that advisors could only provide "emotional support" and that the purpose of the process was educational, not punitive.  (Paras. 53-54).  Based on these statements, John incorrectly believed that any sanction would be educational in nature rather than

in the form of a suspension or expulsion.  (Para. 55).  Therefore, he did not tell his family about the upcoming hearing and, like his two friends, declined the assistance of an advisor.  (Para. 56).

The College held the joint disciplinary hearing on May 5, 2022, before a panel of three hearing officers (the "Hearing Board").  (Para. 57).  All three freshmen attended the hearing, made statements and answered questions.  (Para. 59).  At the outset, John accepted responsibility for certain violations, such as underage alcohol consumption, but denied involvement in the physical altercation with Junior 1.  (Para. 58).  Junior 1 and Witness A also attended the hearing and offered their versions of the events.  (Para. 60).  Junior 2, however, did not attend.  (Para. 61).

When the freshmen asked about Junior 2's absence, Mr. Connell responded that the College could not compel him to appear.  (Para. 62).  Unfortunately, Junior 2's testimony was essential to determining John's responsibility because by nearly all accounts, save that of Witness A, he was the only one John had contact with.    (Para. 63).  All three freshmen agreed that it was only Freshman 1 who fought with Junior 1.  (Para. 64).  Junior 1 could not recall if anyone other than Freshman 1 had kicked or hit him.  (Para. 65).  Thus, Witness A was alone in claiming that John and Freshman 2 also participated in Junior 1's assault.  (Para. 69).  On the basis of her testimony alone, the Hearing Board found John equally responsible with his two friends for all of the alleged violations.  (Para. 71-72).

Following the hearing, the College sanctioned all three freshmen in like manner: a one-year suspension, completion of an anger management program, a letter of apology, payment of a fine, and completion of an alcohol screening and intervention program.  (Para. 72).  It also advised that the College will not recognize or accept credits for course work that John may complete at any other college or university during the pendency of the one-year sanction.  (Para. 73).  Though John appealed the Board's findings on multiple bases, the College denied the appeal without comment.  (Para. 74).

## STANDARD OF REVIEW

An application for injunctive relief is "addressed to a trial justice's sound discretion."  *The Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (R.I. 1997).

## DISCUSSION

In order to obtain a preliminary injunction, the moving party bears the burden of showing that he: (1) has a likelihood of success on the merits; (2) will suffer some irreparable injury if the injunction is not granted; (3) such injury outweighs any harm which granting injunctive relief would inflict on the nonmovant; and (4) the public interest will not be adversely affected by the injunction.  See *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir. 1991); *Hasbro, Inc. v. MGA Entm't Inc.,* 497 F. Supp. 2d 337, 340 (D.R.I. 2007).  The following addresses each of these elements in detail.

I.      <u>John has shown a reasonable likelihood of success in demonstrating the College's breach of contract because the *Student Handbook* constitutes an education contract and the College violated multiple provisions therein while adjudicating John.</u>

A plaintiff need not demonstrate an irrebuttable or even a particularly strong chance of success on the merits.  "While plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits, they 'need not show a certainty of success.'"  *League of Women Voters of N.C.* v. *North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); see also *The Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521 (R.I. 1997) ("We do not require a certainty of success … Instead we require only that the moving party make out a prima facie case").  Thus, John may meet this relatively low bar by proffering evidence that, if believed, would support each element of his claim.  The elements of an action for breach of contract are the existence of a contract, breach of that contract, and damages flowing from the breach.  See *Petrarca v. Fidelity and Cas. Ins. Co.*, 884 A.2d 406, 410 (R.I. 2005).

A. *John's relationship with the College is contractual and incorporates the Student Handbook.*

Numerous jurisdictions, including Rhode Island, have concluded that the relationship between student and university is contractual in nature.  See *Gorman v. St. Raphael Academy*, 853 A.2d 28, 34 (R.I. 2004).  In *Mangla v. Brown University*, the First Circuit stated, "[t]he student-college relationship is essentially contractual in nature."  *Mangla v. Brown University*, 135 F.3d 80, 83 (1st Cir. 1998).  "The terms of the contract may include statements provided in student manuals and registration materials."  *Id*., citing *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir. 1977) (construing College Manual and Academic Information booklet as terms of a contract between a student and college).  Moreover, "[t]he proper standard for interpreting the contractual terms is that of 'reasonable expectation – what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.'"  *Id*., quoting *Giles v. Howard University,* 428 F. Supp. 603, 605 (D.D.C. 1977). A university may be held to a student's reasonable expectations based on its handbooks or policies, "even if the precise expectation is not stated explicitly in the contract's language but, instead, when the student's expectation, viewed objectively alongside the express terms of the contract, is based on the student's fair interpretation of the contract's provisions." *Sonoiki v. Harvard Univ.*, No. 20-1689 (1st Cir. 2022) (slip op. at 32).

In December of 2020, the College offered John admission to the Class of 2025.  (Para. 17).  As part of its admissions packet, the College provided and required John's compliance with its school policies, including the *Student Handbook 2021-22*, which policies afford John certain contractual rights.  (Paras. 76-77).  John accepted the College's offer and paid the College tuition.  (Paras. 18-19).  The College accepted John's tuition payments and enrolled him in classes.  (Paras. 19-20).  Accordingly, John's acceptance of the College's offer of enrollment, payment of tuition

and enrollment in classes created a contract between him and the College, the terms of which are set forth, among other places, in the *Student Handbook.* (Paras. 76-77).

    **B.** *John has a prima facie claim for breach of contract because the College ignored his right to confidentiality, adjudicated him at a joint hearing, failed to procure a key witness without notice, and imposed a sanction that derails his education.*

As a member of the College community, John reasonably expected that the College and he were equally bound by the *Student Handbook.* (Para. 78). The College guaranteed John certain contractual rights by way of these policies. (Para. 77). In pertinent part, the *Student Handbook* entitles students to:

- "confidentiality, with disclosures made on a need-to-know basis only;"

- an individual disciplinary hearing unless they "voluntarily waive their right to confidentiality;"

- "an advisor . . . before, during, or after meetings or proceedings;"

- "a fair opportunity to provide relevant information via statements, documents, and witnesses;"

- "notice of the charges and an explanation of the grievance process;"

- "access to relevant information [and] a reasonable time frame to prepare for a proceeding;"

- "a reasonable and fair outcome, applying the preponderance of evidence standard of proof;" and

- a "fundamentally fair" sanction.

(Paras. 79, 81, 83, 85, 87, 89, 91). In this instance, the College breached all these provisions.

To begin, the College failed to afford John his right to confidentiality and to an individual hearing absent his knowing waiver of that right. (Para. 80). In fact, no one at the College ever met with him about his disciplinary proceeding outside of the presence of the other two

respondents.  (Para. 47).  Mr. Connell, the College's Director of Community Standards, even used

his first meeting with the freshmen to gather them all together and cajole them as a group to accept

a joint hearing, presenting the matter as a decision the College had already made.  (Para. 44).  At

such a momentous meeting, the three students had a right per the *Student Handbook* to receive the

assistance of an advisor.  (Para. 81).  Mr. Connell, however, used the meeting to persuade the three

freshmen that advisors were unnecessary because the nature of the hearing was educational, not

punitive, and all an advisor could do is provide "emotional support."  (Paras. 53-54).  He neglected

to mention that advisors could also "ask for procedural clarifications," such as their options for an

individual rather than a joint hearing.  (Para. 53).  In any event, per the *Student Handbook* and the

College's own communications, a written waiver of confidentiality was required prior to a joint

hearing, and John never provided one.  (Paras. 43, 46, 79).  The College, nonetheless, went forward

with a joint hearing all the same.  (Para. 80).  Had John known he actually had a choice or that

suspension was on the table, which an advisor would likely have explained, John would have

declined a joint hearing because it was not in his interest as his involvement in the altercation was

marginal.  (Para. 48).

In addition to the above, at the hearing, John was surprised to learn that Junior 2 would not

be present.  (Para. 61).  The case file he received indicated that Junior 2 had been interviewed and,

contrary to his own recollection, Junior 2 had claimed he was holding John back during the

altercation instead of the other way around.  (Paras. 40, 50).  Regardless, the gist was that John

and Junior 2 were occupied with each other, not with Junior 1, which agrees with what all three

freshmen had stated.  (Paras. 40, 64).  As for Junior 1, he could not recall if John assaulted him in

any way.  (Para. 65).  So, Witness A was the only one who claimed that John participated in Junior

1's assault, and in the absence of Junior 2, there was no one but the accused students to refute her

claim.  (Para. 69).  Consequently, Junior 2's surprise absence hobbled John's defense.  But, it need not have been that way.

Though Mr. Connell claimed he could not compel Junior 2's appearance, the St*udent Handbook* clearly states "the Director of Community Standards, or designee, will determine which witnesses shall be compelled to appear and failure to appear may result in a disciplinary charge." (Para. 62).  Accordingly, it appears that Mr. Connell, the Director of Community Standards, did not accurately comprehend his own authority.  This misunderstanding led to the violation of several of John's contractual rights, including the rights to an opportunity to provide relevant information and witnesses like Junior 2, to receive notice and an explanation of the hearing process, such as what witnesses would be present, to suggest questions for witnesses, and to have access to relevant information and a reasonable time to prepare.  (Paras. 83-88).  It also severely compromised John's right to "a reasonable and fair outcome, applying the preponderance of evidence standard of proof." (Paras. 89-90).  The reason is that, again, Junior 1 had no recollection of John hitting him, and the only non-accused who could counter Witness A's claim that John was a participant was Junior 2.   (Paras. 63, 65).   But, the College failed to procure Junior 2's appearance.  (Paras. 61-62).

Effectively, by not procuring Junior 2's appearance, the College narrowed the available evidence and reinforced Witness A's testimony, which incidentally, had changed in two important respects since the time of her initial interview with Public Safety.  (Paras. 66-68).  This narrowing of the evidence necessarily influenced the Hearing Board when determining what a preponderance of the evidence showed – whether it suggested Witness A, or the three freshmen, was telling the truth – because the Board simply had less information go on.  That, in turn, undermines the fundamental fairness of John's sanction, which was on par with that handed down to Freshman 1 who admittedly played an active role in the altercation.  (Para. 64, 72).

These mistakes and arbitrary decisions fly in the face of John's reasonable expectations, constitute multiple breaches of the College's contractual obligations, and damaged John's educational and career prospects. Based on the foregoing, there is a reasonable likelihood that John's breach of contract claim will meet success.

II.      <u>John will suffer irreparable harm if injunctive relief is not granted because his damages are in the nature of lost time and educational opportunities, emotional trauma, and a tarnished reputation.</u>

Monetary damages will not adequately compensate John for the cascade of consequences that will flow from his suspension. First, there is the derailment of his academic program and ability to pursue it in an ordinary and timely manner. (Para. 100). That significant loss of time will impact John's academics in unforeseeable ways, deprive him of internships and educational opportunities, and delay John's graduation and professional career. (Para. 100). The substantial gap will further demand an explanation when John begins searching for employment or admission to business school, and the disclosure that the College found he participated in the beating of a fellow student based on that student's sexual orientation will tarnish John's reputation, undermine confidence in his judgement and character, and diminish his educational and career opportunities. (Para. 100). All of this, moreover, has reawakened emotional struggles John once battled as a child. (Para. 101). At a young age, John had a history of anxiety, and now, present circumstances have triggered a recurrence. (Para. 101). He vomited upon learning of his suspension, and in the days and weeks intervening, he has struggled to maintain his appetite, has lost weight, and has lost interest in his normal activities. (Para. 101).

This kind of loss of time and educational opportunities, delayed graduation, and emotional and reputational harm are well recognized as irreparable. See, e,g., *Elmore v. Bellarmine Univ.*, 2018 WL 1542140, at 7 (W.D. Ky. Mar. 29, 2018) (finding irreparable harm because "probation would damage Elmore's academic and professional reputations and may affect his ability to enroll

at other institutions"); *Doe v. Pa. State Univ.*, 276 F. Supp. 3d 300, 314 (M.D. Pa. Aug. 18, 2017) ("Doe's ensuing gap, or delay, in completion of the program would constitute irreparable harm"); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, at 12 (N.D. Ind. May 8, 2017) ("The questions the gap raises, and the explanation it requires, are potentially damaging to John in a manner not compensable by money damages"), vacated at parties' request, 2017 WL 7661416 (N.D. Ind. Dec. 27, 2017); *Doe v. Middlebury Coll.*, 2015 WL 5488109, at 3 (D. Vt. Sept. 16, 2015) (finding that "money damages cannot compensate for the loss of [the accused's] senior year in college with his class, the delay in the completion of his degree, or the opportunity to begin his career in July 2016 with this particular employment" and that he "would have to explain, for the remainder of his professional life, why his education either ceased prior to completion or contains a gap"); *King v. DePauw Univ.*, 2014 WL 4197507, at *13 (S.D. Ind. 2014) (finding that "inevitable" need to explain gap on record to future employers or graduate school admissions committees would result in irreparable harm); *Coulter v. E. Stroudsburg Univ.*, 2010 WL 1816632, at 3 (M.D. Pa. May 5, 2010) (finding irreparable harm on account of delay in plaintiff's "completion of her degree and her eventual graduation . . . this is time and progress that she will not ever be able to retrieve"); *Doe v. Texas A&M Univ.-Kingsville*, No. 2:21-cv-00257 (S.D. Tex. Nov. 5, 2021), ECF No. 18 ("Defendant suggested that monetary damages would be sufficient, but could not articulate how they could compensate for the lost semester, much less the complete loss of an opportunity for education"); *Doe v. Pa. State Univ.*, No. 4:15-cv-02072 (M.D. Pa. Oct. 28, 2015) ECF No. 12 (counting "the deprivation of [Doe's] right to continue his education in an ordinary and timely manner" among his irreparable harm), vacated as moot, No. 4:15-cv-02072 (M.D. Pa. Apr. 4, 2016), ECF No. 49. Therefore, the cascade of consequences that will flow from John's suspension are "precisely the type of irreparable injury for which an injunction is appropriate since a legal

remedy such as monetary damages would be inadequate to compensate the victim for its loss." *The Fund for Community Progress*, 695 A.2d at 523.

III.     <u>The balance of equities tilts to John because the College will suffer no damage if relief is granted, and the public interest favors the upholding of contractual rights.</u>

Against the clear threat of irreparable harm to John, very little is balanced on the other side of the scale. The *Student Handbook* affords a fair, standardized procedure, a procedure which – it must be said – retains value only so long as the rights contained therein are respected, understood, and adhered to. There can be little doubt that the College breached John's confidentiality, used that breach to obtain consent to a joint hearing and eschew advisors, and then hobbled John's defense by narrowing the evidence as a result of Mr. Connell's failure to understand and exercise his authority to compel Junior 2's presence. (Paras. 44, 47, 53-56, 84-88). Moreover, aside from this one episode, John has a pristine disciplinary record. (Para. 15). Thus, at stake for the College is little more than indiscriminate freedom of action in this disciplinary matter, a freedom it expressly contracted away. And, to be clear, John does not seek to avoid the disciplinary process. Rather, he simply seeks the process that the *Student Handbook* promised. The cost to the College will be little, and nothing more nor less than what it bargained for.

IV.     <u>Injunctive relief is necessary to maintain the status quo</u>

This court possesses "broad discretionary power to take provisional steps restoring the status quo pending the conclusion of a trial." *Cohen v. The College University*, 991 F.2d 888, 906 (1st Cir. 1993). The status quo is generally defined as "the last peaceable status prior to the controversy." *E.M.B. Associates, Inc. v. Sugarman*, 372 A.2d 508, 509 (R.I. 1977) citing 11A *Wright and Miller, Federal Practice and Procedure*, § 2948. In cases where students contest suspension or expulsion, numerous courts have found that entering a preliminary injunction to permit a student to remain a student does not alter the status quo, because the last peaceable status

was prior to imposition of the discipline.  See, e.g., *Doe v. Pa. State Univ.*, 276 F. Supp. 3d at 315

n. 107; *Doe v. Rensselaer Polytechnic Inst.*, 2020 WL 6544607, at 5 (N.D.N.Y. 2020); *Madej v.*

*Yale Univ.*, 2020 WL 1614230, at 5 (D. Conn. 2020); *Doe v. Vassar Coll.*, 2019 WL 6222918, at

4 (S.D.N.Y. 2019); *Ritter v. State of Oklahoma*, 2016 WL 2659620, at 2 n. 9 (W.D. Okla. 2016).

In this case, the status quo is the status between the parties as of the day before John's May 5, 2022

hearing.

## CONCLUSION

For the reasons set forth herein, Plaintiff John Smith respectfully requests that this

Honorable Court restrain and enjoin Defendant Providence College from suspending him on the

basis of the irregular and unfair May 5, 2022 hearing and order a new disciplinary proceeding in

strict accordance with John's contractual rights under the *Student Handbook*, including but not

limited to an individual hearing at which Junior 2 appears as a witness subject to questioning.

Dated: July 18, 2022

The Plaintiff, John Smith,
By his Attorneys,

/s/ J. Richard Ratcliffe

J. Richard Ratcliffe, #2603
Jeffrey Biolchini, #7320
Ratcliffe Harten Galamaga LLP
40 Westminster Street, Suite 700
Providence, RI 02903
Tel: (401) 331-3400
Fax: (401) 331-3440
rratcliffe@rhgllp.com
jbiolchini@rhgllp.com

/s/ Ruth O'Meara-Costello

Ruth O'Meara-Costello - *pro hac vice pending*
Massachusetts BBO #667566
Zalkind Duncan & Bernstein LLP
65A Atlantic Ave.
Boston, MA 02110
Tel: (617) 742-6020
rcostello@zalkindlaw.com

## CERTIFICATE OF SERVICE

I, J. Richard Ratcliffe, certify that on <u>July 18, 2022</u>, this document was electronically
filed through the Court's CM/ECF system and is available for viewing and downloading to all
registered counsel of record.

*/s/ J. Richard Ratcliffe*